UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

Solidstrip, Inc.,

    Plaintiff,

v.

U.S. Technology Corporation;
Raymond F. Williams;
U.S. Technology Media Corporation
Anthony Giancola;
Mark E. Cundiff;
Missouri Green Materials;
Daryl Duncan; and
Penny Duncan,

    Defendants.

Case No. 20-CV-822

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Solidstrip, Inc. ("Solidstrip"), brings this Complaint against Defendants U.S. Technology Corporation ("U. S. Technology"), Raymond F. Williams, U. S. Technology Media Corporation ("U. S. Technology Media"), Anthony Giancola, Mark E. Cundiff, Missouri Green Materials, Daryl Duncan and Penny Duncan, (collectively, "Defendants") and alleges as follows:

### <u>Introduction</u>

1.    In 2012, the U.S. government began an investigation into a longstanding conspiracy of Defendants to bribe and influence government officials in order to defraud the government by preventing fair bidding on government contracts for a substance used to strip paint from the surface of various objects, including aircraft.  To wit, Defendants caused government officials to grant lucrative contracts to Defendants U.S. Technology and U.S. Technology Media through bribery,

influence and other illegal means.

2.      In 2017 and 2018, all Defendants (except U. S. Technology Media and Anthony Giancola) pleaded guilty in various cases to federal criminal charges related to this defrauding of the U. S. government. In so pleading, those Defendants admitted the government could prove the charges leveled against them beyond a reasonable doubt.

3.      This lawsuit arises out of Defendants' illegal conduct and the effects of this behavior on Plaintiff Solidstrip, which offered and continues to offer the same products at a lower cost underlying the government contracts for which Defendants conspired and continue to conspire to defraud the government over.

4.      Defendants' actions—actions to which they admitted and for which they were convicted—directly damaged Solidstrip, the only other entity that has a competing product to bid on the government contracts at issue in this lawsuit.

5.      If Defendants had not designed and participated in the conspiracy to defraud the government, Solidstrip would have won the contracts which Defendants ultimately won.

6.      Solidstrip now brings this lawsuit to stop any ongoing fraud occurring against the U.S. government, prevent such fraud by Defendants going forward, and be compensated for the wrongful actions of Defendants.

**Parties**

7.      Plaintiff, Solidstrip, Inc., is a Wisconsin corporation with its principal place of business in Minocqua, Wisconsin.

8.      Defendant U. S. Technology was an Ohio corporation with its principal place of business in Canton, Ohio.  U. S. Technology conducted business throughout the United States, including in the State of Wisconsin.

2

9.      Defendant Raymond F. Williams ("Williams) is sued in his personal capacity and, upon information and belief, is a resident of Ohio.

10.     Defendant U. S. Technology Media is an Ohio corporation with its principal place of business in Bolivar, Ohio.  U. S. Technology Media conducts business throughout the United States, including in the State of Wisconsin. Defendant Anthony Giancola ("Giancola") is sued in his personal capacity and, upon information and belief, is a resident of Ohio.

11.     Defendant Mark E. Cundiff ("Cundiff") is sued in his personal capacity and, upon information and belief, is a resident of Georgia.

12.     Defendant Missouri Green Materials is a Missouri corporation with its principal place of business in Berger, Missouri.

13.     Defendant Daryl Duncan is sued in his personal capacity and, upon information and belief, is a resident of Missouri.

14.     Defendant Penny Duncan is sued in her personal capacity and, upon information and belief, is a resident of Missouri.

## Jurisdiction and Venue

15.     This Court has federal diversity jurisdiction over the claims in the present action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy is over $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

16.     Venue lies in this district pursuant to 28 U.S.C. § 1391, because all Defendants do business and/or hold themselves open to doing business throughout the United States and, for some Defendants, also abroad.

17.     Venue additionally lies in this district pursuant to 28 U.S.C. § 1391 because some of the acts giving rise to the present action occurred in this district.

3

<u>**Factual Allegations**</u>

**I.** **The Technology: Plastic Media Blasting**

18.     The technology underlying this lawsuit is a type of abrasive blasting material, called plastic media blasting, plastic blasting media, or some variation thereof ("PMB").

19.     PMB is a method to remove paint or similar products from an object's surface.

20.     During the PMB process, air or some combination of air and an abrasive or abrasives (such as sand and/or water) is used to remove the paint or similar product from an object's surface.

21.     PMB as a method of paint removal is safer, more environmentally friendly, and more cost effective than the chemical stripping of paint.

22.     The primary PMB involved in this case is Type VIII plastic media ("Type VIII").

23.     Type VIII is often used to remove paint and surface substances from composite materials and is the preferred way to remove paint or other substances from the composite surfaces of modern aircraft.

24.     Because Type VIII is the preferred way to remove paint from certain aircraft, the branches of the U.S. Armed Forces often specify it via the bid process for government projects.

25.     Since 2011, there have been only two approved and qualified suppliers for Type VIII plastic media in the world listed on the government's Qualified Products List ("QPL"): Solidstrip and U.S. Technology.

26.     In 2015, U. S. Technology Media purchased the business assets (including the Type VIII business) of U. S. Technology for $20,000,000, with no money down and the balance to be paid at a rate of 30% of gross sales.

27.     As part of that purchase, U. S. Technology Media assumed U. S. Technology's

contracts with the government, including contracts for sales of Type VIII.

28.     U. S. Technology sold, and now U. S. Technology Media sells, Type VIII under the brand names "Magic®" and "Magic II®."

29.     Solidstrip does not sell Type VIII under a brand name but uses its generic name of Type VIII.

**II.     Recycling of Type VIII PMB**

30.     After use and reuse, PMB media breaks down into spent media or dust waste.

31.     Often this PMB spent media contains hexavalent chromium and cadmium above regulatory limits and is therefore designated hazardous solid waste.

32.     PMB spent material is notoriously difficult to recycle.

33.     There are currently no proven legitimate recycling methods for Type VIII spent media under the Resource Conservation and Recovery Act ("RCRA").

34.     U. S. Technology, and now U. S. Technology Media, purported and purport to "recycle" PMB spent media by adding small quantities of the spent media into concrete building blocks and concrete products.

35.     Because the PMB spent media contains hexavalent chromium and cadmium, its use in concrete building blocks and concrete products limits the potential uses of the concrete products.

36.     In particular, concrete building blocks and concrete products containing PMB spent media cannot be used in anything but above grade functions due to possible leaching of the concrete products.

37.     There is not a significant demand for these concrete building blocks and concrete products because of their limited ability to be used.

38.     Because of this lack of demand, U. S. Technology Media and U. S. Technology

before it "speculatively accumulated" and continue to "speculatively accumulate" millions of pounds of PMB spent material.

39.     "Speculative accumulation" is the accumulation of materials to be recycled, without actually recycling sufficient quantities to qualify as a legitimate recycler under the RCRA. 40 CFR § 260.30.

40.     The RCRA requires that a legitimate recycling process "must produce a valuable product." 40 CFR § 260.43(2).

41.     When a recycling process uses spent material in a manner that does not produce a valuable product, this is essentially disposal of the spent material and does not qualify as legitimate recycling under the RCRA.

42.     This "speculative accumulation" of PMB spent material by U. S. Technology Media and U. S. Technology means they violate the RCRA recycling requirements and are not legitimate recyclers under the terms of the RCRA.

43.     Thus, the U. S. Technology "recycling program"—a "recycling program" that continues to be promoted by U.S. Technology Media—is not a legitimate recycling program under the RCRA but is a sham.

44.     That the "recycling program" of U.S. Technology and U.S. Technology Media is and was not legitimate is evidenced by the criminal convictions discussed in the next section of this Complaint.

III.    **The Parties and Ongoing Conspiracies**

   A.  **Solidstrip**

45.     Solidstrip is a Wisconsin company that manufactures and sells plastic media for use in plastic media blasting applications.

46.     Among other types of PMB it sells, Solidstrip sells Type VIII PMB.

47.     The main governmental customers for the kind of plastic media Solidstrip manufactures are the U.S. Armed Forces, the U.K. Ministry of Defense, and the North American Treaty Organization ("NATO").

48.     To obtain the contracts for these military uses of plastic media, Solidstrip regularly participates in government bidding processes.

49.     To bid for U. S. government contracts for Type VIII, Solidstrip (or anyone else wishing to bid on Type VIII U. S. government contracts or similar contracts) must become an approved vendor through a government-run process that ensures the company's product meets the government's requirements for that particular product.

50.     This government-run process that ensures the products meet the government's requirements is known as "First Article Testing."

51.     In 2011, Solidstrip became an approved vendor for Type VIII and other PMB products.

52.     Upon information and belief, Solidstrip is currently only one of two approved vendors for Type VIII.

53.     Upon being certified as an approved vendor for Type VIII, Solidstrip began bidding on government contracts requesting Type VIII plastic media.

54.     As set forth below, however, Solidstrip immediately ran into a problem securing and keeping government contracts because its only competitor in the Type VIII market was conspiring with government employees and possibly others to prevent Solidstrip from gaining and keeping those contracts.

**B.** **U. S. Technology, Raymond Williams and Mark Cundiff Bribe and Engage in Fraud to Win Government Contracts for Type VIII.**

55. The only other major producers of Type VIII in the world at the times relevant to this Complaint have been U. S. Technology and U. S. Technology Media.

56. At the current time, only U.S. Technology is listed on the government QPL, the approved list of government vendors.

57. U.S. Technology Media functions as a successor company to U.S. Technology.

58. At no time have U.S. Technology and U.S. Technology Media produced Type VIII at the same time, nor have they ever bid on Type VIII government contracts at the same time.

59. During the times relevant to this Complaint, Defendant Williams served as the owner and chief executive officer of U. S. Technology.

60. Like Solidstrip, U. S. Technology sold Type VIII and was an approved government vendor for Type VIII.

61. U. S. Technology sold Type VIII plastic media under the trade names "Magic®" and "Magic II®."

62. U. S. Technology bid on government contracts requesting Type VIII plastic media.

63. To obtain those government contracts, however, U.S. Technology conspired with the other Defendants and used illegal techniques to obtain government contracts for Type VIII PMB.

64. Among the illegal techniques U. S. Technology used to win government contracts was to bribe government official(s) and individuals with influence over government officials so they would insert improper contract terms in government contracts, such that U. S. Technology was the only company able to meet the contract requirements.

65. For example, U. S. Technology encouraged government officials to include clauses

8

requiring the use of "Magic" Type VIII, even though the use of a trade name in a government contract is improper and prohibited by Federal Acquisition Regulation 11.105, which states that "agency requirements shall not be written so as to require a particular brand name, product, or feature of a product, peculiar to one manufacturer, thereby precluding consideration of a product manufactured by another company.".

66.     Similarly, U. S. Technology bribed and encouraged government official(s) and individuals with influence over government officials to include terms in government contracts that were impossible for anyone to meet without engaging in fraud.

67.     For example, U. S. Technology sought and obtained the inclusion of recycling clauses in government contracts for Type VIII, even though there is currently no recycling program that legitimately meets the requirements for recycling under RCRA.

68.     Since 2017, Williams has been indicted and entered into a plea agreement in at least one case in which he admitted the government could prove beyond a reasonable doubt that he bribed government officials to include trade names and recycling requirements in government contracts.

69.     Mark E. Cundiff, formerly an employee of the Department of Defense who participated in technical engineering support with respect to PMB throughout all branches of the U. S. Military, has pleaded guilty to conspiring with Williams and U. S. Technology to ensure that U. S. Technology was the only company that could secure government contracts for Type VIII and other PMB products.

**C.      Williams and U. S. Technology Bring Missouri Green Materials, Daryl Duncan, and Penny Duncan Into the Conspiracy.**

70.     Upon information and belief, Williams and U. S. Technology were aware that no technology existed to recycle Type VIII in a manner that fulfills the strict requirements of the

9

RCRA.

71.     Upon information and belief, Missouri Green Materials, U. S. Technology, and U.S. Technology Media have never recycled the spent material in anything near the quantities required to be considered legitimate recyclers under the RCRA.

72.     Upon information and belief, Williams and U. S. Technology conspired with Missouri Green Materials and its owners and officers, Daryl Duncan and Penny Duncan, to ship millions of pounds of spent media to Missouri.

73.     Once shipped to Missouri, Missouri Green Materials, Daryl Duncan, and Penny Duncan stored the spent media instead of recycling it.

74.     The government contracts which Williams and U.S. Technology had won, however, required that this spent material be recycled as specified by the RCRA.

75.     Williams and U. S. Technology therefore knowingly conspired to bid on government contracts, knowing they would not and could not recycle the Type VIII material, but would ship it in violation of the terms of the government contracts and in violation of the RCRA.

**D.     U. S.  Technology Media Continues to Engage in the Conspiracy Begun by  U. S. Technology to Obtain Government Contracts Through Bribery and Fraud.**

76.     Upon information and belief, Williams sold the assets of U.S. Technology to U. S. Technology Media on or about March 31, 2015.

77.     The assets sold included U.S. Technology's Type VIII products, including wrongfully obtained government contracts for those products.  Upon information and belief, the assets also included US Technology's sham recycling process.

78.      Upon information and belief, the terms of the sale were $20,000,000 with no money down with future payments made to Williams and U.S. Technology based on 30% of gross sales.

79.     Upon information and belief, at or immediately after the sale, U.S. Technology

fired all of its employees and the next day US Technology Media hired all of the same employees. U.S. Technology Media now conducts business out of U.S. Technology's former buildings and offices.   U.S. Technology Media inventory was received from U.S. Technology.   The two companies used the same computer system, the same operating system and had the same officers and same employees and operated out of the same location.

80.    U. S.  Technology Media continued in the place of U. S. Technology on the wrongfully obtained contracts.

81.    Indeed, that U.S. Technology Media continued in the place of U.S. Technology is underscored by the fact that it continues to bid on government contracts as an approved vendor, even though it never obtained such clearance and instead relies on the approved vendor status of U.S. Technology.

82.    Upon information and belief, U.S. Technology and U.S. Technology Media were and are treated as a single entity or alter-egos of each other.  U.S. Technology Media did not pay fair value for the assets of U.S. Technology, including the government contracts, and the transaction was not a commercially reasonable transaction. The sale instead served as merely a scheme to continue cash flow from ill-gotten contracts to U.S. Technology and Williams.

83.    There is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.

84.    Also or alternatively, U.S. Technology Media is the successor corporation of U.S. Technology as it is merely a continuation of U.S. Technology and/or the purchase of the assets of U.S. Technology by U.S. Technology Media and other related transactions were entered into fraudulently to escape or avoid liability.

11

85.     Upon information and belief, U. S. Technology Media continued the practices of U. S. Technology, including adopting and encouraging the improper use of trade names and recycling requirements in government contracts it currently services and intends to bid on in the future.

## II.     Defendants Plead Guilty to the Ongoing Conspiracy

86.     Numerous Defendants in the present case already pled guilty and been convicted of various federal violations related to illegally obtained government contracts for PMB media and other media bundled with PMB media contracts.

### A.     The Williams Plea Agreement

87.     On March 14, 2018, in Case No. 5:17-cr-29-LJA in the United States District Court for the Middle District of Georgia, Defendant Williams accepted a plea agreement. A copy of this plea agreement is attached hereto as Exhibit A.

88.     Pursuant to the plea agreement, Williams pleaded guilty to Conspiracy to Bribe a Public Official in violation of 18 U.S.C. §§ 371 and 372.

89.     Williams also entered into a stipulation as part of his plea agreement. Paragraphs 92 to 104, set forth below, include facts taken from the stipulation.

90.     Williams developed a close relationship with Defendant Cundiff in which they, among other activities, vacationed together. Exhibit A, p. 12.

91.     In 2004 or 2005, Williams requested Cundiff's help in procuring contracts to supply PMB media to the U.S. Air Force for his company, U. S. Technology. Exhibit A, p. 13.

92.     Williams' friend Cundiff was solely responsible for preparing Performance Work Statements at Robins Air Force Base. Exhibit A, p. 13.

93.     A Performance Work Statement is a document that sets out the standards a bidding

company must meet to obtain a specified job from the United States Air Force. Exhibit A, p. 13.

94.     Williams dictated the contract requirements for the new Performance Work Statements prepared by Cundiff. Exhibit A, p. 13.

95.     The Performance Work Statement Cundiff drafted required that the only PMB that could be used were the patented U. S. Technology products "Quickstrip" and "Magic." Exhibit A, p. 13.

96.     The Performance Work Statement also required that the bidding party have a facility within a certain distance of Robins Air Force Base. Exhibit A, p. 13.

97.     Finally, the Performance Work Statement had a PMB recycling requirement. Exhibit A, p. 13.

98.     Because of the requirements of the Performance Work Statement Cundiff included at the request of his friend Williams, the only company that could meet its requirements was Williams' company, U. S. Technology. Exhibit A, p. 13.

99.     In return for the drafting of the Performance Work Statement in a way that guaranteed U. S. Technology would be the winning bidder for U.S. Air Force contracts at Robins Air Force Base, Williams paid Cundiff for his services. Exhibit A, p. 13.

100.     Cundiff also used his position to ensure Williams and U. S. Technology received contracts for NATO's purchase of PMB. Exhibit A, p. 13.

101.     On March 31, 2015, Williams sold the portion of U. S. Technology that made PMB to U. S. Technology Media. Exhibit A, pp. 15-16.

102.     As part of the sale, U. S. Technology sold the rights to contracts that had been obtained as a result of Cundiff's actions to U. S. Technology Media. Exhibit A, p. 16.

### B.    The U.S. Technology Plea Agreement

103.    On March 14, 2018, in Case No. 5:17-cr-29-LJA in the United States District Court for the Middle District of Georgia, Defendant U. S. Technology accepted a plea agreement. A copy of this plea agreement is attached hereto as Exhibit B.

104.    Pursuant to the plea agreement, U. S. Technology pleaded guilty to Conspiracy to Launder the Proceeds of Unlawful Activity pursuant to 18 U.S.C. § 1956(h).

105.    U. S. Technology also entered into a stipulation as part of its plea agreement. Exhibit B, p. 11.

106.    The facts set forth in the stipulation are, in large part, the same as those set forth in Williams' plea agreement as noted in the previous section. Exhibit B, pp. 11-15.

### C.    The Cundiff Plea Agreement

107.    On April 17, 2017, in Case No. 5:17-cr-16-MTT in the United States District Court for the Middle District of Georgia, Defendant Cundiff accepted a plea agreement. A copy of this plea agreement is attached hereto as Exhibit C.

108.    Pursuant to the plea agreement, Cundiff pleaded guilty to Conspiracy to Bribe a Public Official pursuant to 18 U.S.C. §§ 371 and 372.

109.    Cundiff also entered into a stipulation as part of his plea agreement and Paragraphs 112 to 126, set forth below, include facts taken from that stipulation.

110.    As an employee of the Department of Defense, Cundiff was stationed at Robins Air Force Base in Warner Robins, Georgia. Exhibit C, p. 16.

111.    Cundiff and Williams developed a close relationship in which they, among other activities, vacationed together. Exhibit C, p. 16.

112.    As part of his employment, Cundiff was responsible for technical engineering

14

support to military aircraft operations and was responsible for preparing statements of work when Robins Air Force Base was soliciting bidders for new contracts. Exhibit C, p. 16.

113.    In 2004 or 2005, Cundiff prepared a new Performance Work Statement for PMB. Exhibit C, p. 17.

114.    A Performance Work Statement is a document that sets out the standards a bidding company must meet to obtain a particular job from the United States Air Force. Exhibit C, p. 17.

115.    With the input of his close friend Williams, Cundiff prepared the new Performance Work Statement. Exhibit C, p. 17.

116.    The Performance Work Statement Cundiff drafted required that the only PMB that could be used were the patented U. S. Technology products "Quickstrip" and "Magic." Exhibit C, p. 17.

117.    The Performance Work Statement also required that the bidding party have a facility within a certain distance of Robins Air Force Base. Exhibit C, p. 17.

118.    Finally, the Performance Work Statement had a PMB recycling requirement. Exhibit C, p. 17.

119.    Because of the requirements of the Performance Work Statement Cundiff included at the request of his friend Williams, the only company that could meet its requirements was Williams' company, U. S. Technology. Exhibit C, p. 17.

120.    In return for the drafting of the Performance Work Statement in a way that guaranteed U. S. Technology would be the winning bidder for U.S. Air Force contracts at Robins Air Force Base, Williams paid Cundiff for his services. Exhibit C, pp. 17-18.

121.    All branches of the U. S. Military have designated the U. S. Air Force to lead in PMB and within that designation Cundiff held a critical role of influence.

122.    Through Cundiff's critical influential role, foreign militaries and commercial entities were led to adopt Cundiff's specifications for PMB media.

123.    Cundiff also used his position to ensure Williams and U. S. Technology received contracts for NATO's purchase of PMB. Exhibit C, p. 18.

124.    Cundiff ultimately received payments of $274,000 from Williams in return for Cundiff's work to ensure that only U. S. Technology could meet the PMB requirements. Exhibit C, p. 20.

**D.    The Missouri Case**

125.    On April 26, 2017, Defendants U. S. Technology, Missouri Green Materials, Raymond Williams, Daryl Duncan, and Penny Duncan were indicted in Case No. 4:17-CR-00189-RWS-PLC (the "Missouri Case"). A copy of the docket sheet for the case is attached hereto as Exhibit D.

126.    Count One of the Missouri Case indictment alleged a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. A copy of the indictment is attached hereto as Exhibit E.

127.    Pursuant to the indictment, U. S. Technology, through Williams, entered into an agreement with Missouri Green Materials, though Daryl Duncan and Penny Duncan, to send the waste from the PMB process to a warehouse in Missouri. Exhibit E, ¶¶ 6, 25(a).

128.    Upon information and belief, the waste products described in Paragraph 25 were materials U. S. Technology was supposed to be recycling under its contracts with the various branches of the U.S. military and others.

129.    The indictment alleges numerous incidents where U. S. Technology, through

16

Williams, entered into an agreement with Missouri Green Materials, though Daryl Duncan and Penny Duncan, to send the waste from the PMB process to a warehouse in Missouri. Exhibit E, ¶¶ 25(a)-(x).

130.    Ultimately, U. S. Technology, through Williams, entered into an agreement with Missouri Green Materials, though Daryl Duncan and Penny Duncan, and sent approximately 9 million pounds of waste from the PMB process to a warehouse in Missouri. Exhibit E, ¶ 25(z).

131.    Upon information and belief, these 9 million pounds of waste from the PMB process included waste that should have been recycled under its contracts with the various branches of the U.S. military and others but was not.

132.    On June 14, 2018, Defendant Daryl Duncan pleaded guilty to the allegations of a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. Exhibit D, Dkt. Entry Nos. 145-147.

133.    On June 14, 2018, Defendant Penny Duncan pleaded guilty the allegations of a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. Exhibit D, Dkt. Entry Nos. 148-150.

134.    On June 19, 2018, Defendant Williams pleaded guilty to the allegations of a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. Exhibit D, Dkt. Entry Nos. 154-156.

135.    On June 19, 2018, Defendant U. S. Technology pleaded guilty to the allegations of a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and

Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. Exhibit D, Dkt. Entry Nos. 157-159.

136.    On November 20, 2018, Defendant Missouri Green Materials pleaded guilty to the allegations of a conspiracy among U. S. Technology, Missouri Green Materials, Williams, Daryl Duncan, and Penny Duncan to violate the Resource Conservation and Recovery Act under 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2. Exhibit D, Dkt. Entry Nos. 214-215.

### III.    Damages

137.    Because of the provisions improperly included in these government solicitations thanks to the actions of U. S. Technology—actions that now continue under U. S.  Technology Media—Solidstrip was and continues to be unable to bid fairly on these government contracts.

138.    Additionally, when the government solicitations require for Type VIII and/or recycling to be bundled with other types of blasting media, Solidstrip's damages include not only losses directly related to its inability to bid on Type VIII, but also the losses for other types of PMB because it did not and cannot obtain the contracts for these other types of blasting media as a result of the improper Type VIII and recycling requirements.

139.    Solidstrip currently has knowledge of approximately $3.4 million in government contracts granted to U.S. Technology that involved, or were likely to involve, Type VIII and on which Solidstrip was unable to fairly bid on because of improper recycling requirements, specific and improper requirements for the use "Magic®" and "Magic II®," fraudulent representations by U.S. Technology, and/or other improprieties.

140.    The following table lists these contracts:

| Date | Contract Number | Potential Value |
|------|-----------------|-----------------|
| 2/17/2016 | W9127Q16P0015 | $9,300 |
| 9/29/2015 | FA812511D0001-0041 | 44,700 |
| 9/8/2015 | FA812511D0001-0040 | 15,200 |

| | | |
|---|---|---:|
| 7/19/2015 | FA812511D0001-0039 | 2,800 |
| 6/28/2015 | FA812511D0001-0038 | 16,700 |
| 4/9/2015 | FA812511D0001-0037 | 49,700 |
| 5/31/2015 | FA812511D0001-0034 | 103,000 |
| 3/26/2015 | FA812511D0001-0036 | 4,900 |
| 3/18/2015 | FA812511D0001-0035 | 4,400 |
| 3/9/2015 | FA812511D0001-0033 | 196,700 |
| 3/3/2015 | W912LA15P0009 | 77,300 |
| 2/5/2015 | FA812511D0001-0033 | 34,900 |
| 1/7/2015 | FA812511D0001-0030 | 26,600 |
| 12/14/2014 | W9127Q15P0019 | 32,800 |
| 12/3/2014 | FA812511D0001-0029 | 2,900 |
| 11/11/2014 | W91ZRS15M003 | 96,000 |
| 10/28/2014 | FA812511D0001-0028 | 43,500 |
| 9/25/2014 | FA812511D0001-0027 | 111,200 |
| 9/14/2014 | SPEFA514M1796 | 23,800 |
| 9/4/2014 | FA812511D0001-0026 | 35,400 |
| 7/30/2014 | W91ZRS14M0117 | 18,800 |
| 7/23/2014 | FA812511D0001-0025 | 23,500 |
| 6/17/2014 | FA812511D0001-0024 | 16,200 |
| 5/29/2014 | FA812511D0001-0023 | 48,600 |
| 5/15/2014 | SPEFA514M0124 | 10,600 |
| 4/29/2014 | FA812511D0001-0022 | 17,400 |
| 3/24/2014 | W91ZRS14M0054 | 30,000 |
| 3/19/2014 | FA812511D0001-0021 | 14,000 |
| 3/2/2014 | FA812511D0001-0020 | 20,000 |
| 1/23/2014 | FA812511D0001-0019 | 19,000 |
| 1/7/2014 | FA812511D0001-0018 | 25,100 |
| 12/16/2013 | W91ZRS14M0026 | 45,000 |
| 12/15/2013 | FA812511D0001-0017 | 13,700 |
| 10/3/2013 | W912NW14V0003 | 49,300 |
| 10/2/2013 | FA812511D0001-0016 | 18,400 |
| 9/30/2013 | FA460812A0003-G001 | 6,900 |
| 9/30/2013 | FA480013A0015-G001 | 50,000 |
| 9/9/2013 | FA812511D0001-0015 | 45,900 |
| 8/14/2013 | W91ZRS13M0128 | 24,000 |
| 7/28/2013 | FA812511D0001-0014 | 73,800 |
| 6/18/2013 | W912NW13V0234 | 72,500 |
| 6/13/2013 | FA812511D0001-0013 | 52,000 |
| 5/22/2013 | W912NW13V0223 | 72,500 |
| 5/6/2013 | FA812511D0001-0012 | 133,900 |
| 5/2/2013 | W912NW13P0173 | 72,500 |
| 4/15/2013 | FA812511D0001-0011 | 46,100 |

| | | |
|---|---|---|
| 3/13/2013 | W912NS13P0069 | 148,000 |
| 3/11/2013 | FA812511D0001-0010 | 28,600 |
| 2/28/2013 | W912NW13V0157 | 72,500 |
| 1/29/2013 | W91ZRS13M0063 | 24,000 |
| 1/10/2013 | FA812511D0001-0009 | 13,100 |
| 11/13/2012 | W912NW13V0041 | 72,500 |
| 11/5/2012 | W91ZRS13M0027 | 24,000 |
| 10/2/2012 | FA812511D0001-0008 | 121,400 |
| 9/25/2012 | W912NS12P0172 | 35,600 |
| 9/17/2012 | FA812511D0001-0007 | 81,700 |
| 9/6/2012 | W912LA12P0080 | 85,500 |
| 8/15/2012 | FA812511D0001-0006 | 54,700 |
| 8/6/2012 | W912NW12V0413 | 72,500 |
| 7/12/2012 | FA812511D0001-0005 | 64,900 |
| 7/10/2012 | W912NW12V0381 | 72,500 |
| 6/14/2012 | FA812511D0001-0004 | 100,900 |
| 5/21/2012 | FA812511D0001-0003 | 61,500 |
| 4/25/2012 | W91ZRS12M0103 | 22,800 |
| 4/9/2012 | W912NW12V0251 | 105,000 |
| 5/31/2012 | FA812511D0001-0002 | 128,800 |
| 2/23/2012 | W912NW12V0186 | 12,800 |
| 1/30/2012 | W91ZRS12M0058 | 22,800 |
| 7/4/2011 | W912NS11P0132 | 35,600 |
| 5/16/2011 | W91ZRS11M0091 | 22,800 |
| | TOTAL | $3,436,000 |

141.    Upon information and belief, U.S. Technology improperly obtained additional government contracts that will be discovered during the course of litigation.

142.    In addition to the U.S. Technology contracts, Solidstrip currently has knowledge of approximately $4.9 million in additional government contracts granted to U.S. Technology Media that involved, or were likely to involve, Type VIII and on which Solidstrip was unable to fairly bid on because of improper recycling requirements, specific and improper requirements for the use "Magic®" and "Magic II®," fraudulent representations by U.S. Technology Media, and/or other improprieties.

143.    The following table lists these contracts:

| Date | Contract Number | Potential Value |
|---|---|---|
| 10/8/2019 | FA812515D0002-FA813220F0004 | $31,200 |
| 9/16/2019 | W911N215D0012-W911N219F0799 | 28,800 |
| 8/27/2019 | W91ZRS19P0071 | 70,400 |
| 8/6/2019 | FA812515D0002-FA813219FA067 | 77,400 |
| 7/15/2019 | FA812515D0002-FA813219FA062 | 41,100 |
| 6/24/2019 | FA812515D0002-FA813219FA055 | 26,500 |
| 6/6/2019 | W911N215D0012-W911N219F0580 | 28,800 |
| 5/15/2019 | FA812515D0002-FA813219FA038 | 348,800 |
| 4/8/2019 | W911N215D0012-W911N219F0419 | 28,800 |
| 3/13/2019 | FA812515D0002-FA813219FA022 | 13,400 |
| 2/5/2019 | FA812515D0002-FA813219FA012 | 81,900 |
| 1/30/2019 | FA812515D0002-FA813219FA011 | 6,600 |
| 1/17/2019 | W911N215D0012-W911N219F0221 | 28,800 |
| 1/2/2019 | FA812515D0002-FA813219FA003 | 48,000 |
| 10/2/2018 | W911N215D0012-W911N218F0518 | 28,800 |
| 9/24/2018 | FA812515D0002-FA813218F0103 | 773 |
| 9/20/2018 | FA812515D0002-FA813218F0102 | 10,300 |
| 7/31/2018 | FA812515D0002-FA813218F0085 | 14,600 |
| 7/11/2018 | W911N215D0012-W911N218F0343 | 28,800 |
| 6/7/2018 | FA812515D0002-FA813218F0074 | 75,300 |
| 6/4/2018 | W911N215D0012-W911N218F0250 | 28,800 |
| 5/3/2018 | FA812515D0002-FA813218F0059 | 649,600 |
| 4/26/2018 | W911N215D0012-W911N218F0165 | 1,900 |
| 4/4/2018 | FA812515D0002-FA813218F0046 | 526,200 |
| 3/26/2018 | FA812515D0002-FA813218F0038 | 72,500 |
| 1/28/2018 | FA812515D0002-FA813218F0023 | 25,300 |
| 1/9/2018 | FA812515D0002-FA813218F0016 | 88,500 |
| 12/14/2017 | FA812515D0002-FA813218F0013 | 674,000 |
| 11/29/2017 | W91ZRS18P0008 | 105,500 |
| 10/25/2017 | FA812515D0002-FA813218F0005 | 137,500 |
| 10/16/2017 | FA812515D0002-FA813218F0003 | 86,100 |
| 9/19/2017 | FA812515D0002-FA813218F0052 | 22,300 |
| 8/14/2017 | FA812515D0002-FA813218F0044 | 29,300 |
| 7/13/2017 | FA812515D0002-FA813218F0032 | 43,500 |
| 6/15/2017 | FA812515D0002-FA813218F0028 | 81,200 |
| 5/18/2017 | FA812515D0002-FA813218F0020 | 24,300 |
| 4/2/2017 | FA812515D0002-FA813218F0016 | 32,700 |
| 3/14/2017 | FA812515D0002-FA813218F0014 | 31,700 |
| 2/15/2017 | FA812515D0002-FA813218F0008 | 63,200 |
| 1/11/2017 | FA812515D0002-0014 | 188,100 |
| 12/13/2016 | FA812515D0002-0013 | 174,800 |

| | | |
|---|---|---|
| 11/29/2016 | W91ZRS17P0008 | 94,500 |
| 11/27/2016 | FA812515D0002-0012 | 122,500 |
| 10/16/2016 | FA812515D0002-0011 | 101,700 |
| 8/23/2016 | W91ZRS16P0078 | 15,000 |
| 7/28/2016 | FA812515D0002-0011 | 92,800 |
| 7/18/2016 | FA812515D0002-0009 | 76,600 |
| 7/10/2016 | W91ZRS16P0058 | 7,500 |
| 6/8/2016 | FA812515D0002-0008 | 29,400 |
| 5/4/2016 | FA812515D0002-0007 | 89,700 |
| 4/3/2016 | FA812515D0002-0006 | 81,800 |
| 2/23/2016 | FA812515D0002-0005 | 25,500 |
| 1/28/2016 | FA812515D0002-0003 | 16,400 |
| 1/19/2016 | FA812515D0002-0002 | 16,900 |
| 9/23/2015 | FA812515D0002-0001 | 58,400 |
| | TOTAL | $4,934,773 |

144.     Upon information and belief, U.S. Technology Media improperly obtained additional government contracts that will be discovered during the course of litigation.

145.     Moreover, U.S. Technology Media continues to improperly be granted government contracts based on improper recycling requirements, specific and improper requirements for the use of "Magic®" and "Magic II®," fraudulent representations by U.S. Technology Media, and/or other improprieties.

146.     Often government contracts like the ones listed above are only the first in a potential series of renewable contracts.

147.     Upon information and belief, the lists above do not include any of these additional renewals.

148.     In practice, once a party is awarded the first in a potential series of renewable contracts, they also obtain the subsequent contracts.

149.     These additional, renewable amounts constitute additional damages Solidstrip expects to total several million dollars.

150.    In addition to the known improper government contracts listed above, U.S. Technology was awarded at least one contract with the North Atlantic Treaty Organization ("NATO") based on the same improper requirements that have prevented Solidstrip from bidding on U.S. government contracts.

151.    The NATO contract was valued at approximately $25 million.

152.    During litigation, Solidstrip expects to find additional sources of damages of equal or greater amount to those already known.

153.    If the bidding process had been proper, Solidstrip would likely have beaten U.S. Technology in winning the government contracts listed above and those that are yet to be known.

154.    Solidstrip would have won these contracts because Solidstrip prices for Type VIII are lower than those of U.S. Technology.

155.    As set forth above, Defendants had either an explicit or tacit agreement to act in accordance with a mutually agreed-upon scheme or plan.

156.    Defendants committed mutual acts in furtherance of the common scheme or plan, and those acts were negligent or intentional.

157.    The mutual acts of Defendants were the acts that led to Solidstrip's damages set forth above.

158.    Defendants are jointly and severally liable for all damages resulting from their actions pursuant to Wis. Stat. Ann. § 895.045(2).

## First Count

### Against All Defendants

**Intentional Interference with Prospective Contractual Relationship**

159.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth

in this paragraph.

160.    Solidstrip had and has prospective contractual relationships with various governmental entities.

161.    Defendants intentionally interfered with these prospective contractual relationships.

162.    There was a causal connection between Defendants' interference and the damages claimed by Solidstrip.

163.    Defendants' interference was not justified or privileged.

**Second Count**

**Against All Defendants**

**Injury to Business Pursuant to Wis. Stat. § 134.01**

164.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth herein.

165.    Defendants acted together in violation of Wis. Stat. § 134.01 to maliciously injure Solidstrip's business.

166.    Defendants acted with a common purpose to injure Solidstrip's business.

167.    Defendants acted maliciously in carrying out the common purpose.

168.    The acts of Defendants financially injured Solidstrip.

**Third Count**

**Against All Defendants**

**Common Law Conspiracy**

169.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

170.     Defendants knowingly participated in a conspiracy against Solidstrip to deprive Solidstrip of business, based on the acts outlined above.

## Fourth Count

## Against All Defendants

**Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity Pursuant to 18 U.S.C. §§ 1961(4), (5), (9) and 1962(b)**

171.     Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

172.     As set forth above, Defendants acquired and/or maintained, directly or indirectly, an interest in or control of a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise of individuals and business who were associated in fact and who engaged in, and whose activities affected, interstate and foreign commerce in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962 (b).

173.     Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts as listed in 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(b).

## Fifth Count

## Against All Defendants

**Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity Pursuant to 18 U.S.C. §§ 1961(5) and 1962(c)**

174.     Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

175.     As set forth above, Defendants associated with a RICO enterprise of individuals and businesses who were associated in fact and who engaged in and whose activities affected

interstate and foreign commerce.

176.    Defendants conducted and/or participated, either directly or indirectly, in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

177.    Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts as listed in 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(c).

### Sixth Count

### Against All Defendants

### Pattern of Racketeering Activity Pursuant to 18 U.S.C. §§ 1961(5) and 1962(d)

178.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

179.    As set forth above, Defendants conspired to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(b) and (d).

180.    Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts as listed in 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(c).

### Seventh Count

### Against All Defendants

### Commercial Bribery Claim pursuant to 15 USCA 15(c)

181.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

182.    At all relevant times, Defendants were and are engaged in commerce between the States.

183.    Solidstrip was and is a competitor with Defendants U.S. Technology and U.S. Technology Media in the sale of PMB to U.S. governmental entities.  Solidstrip is within an industry and sector of the economy endangered by a breakdown of competitive conditions as evidenced by Defendants' conduct.  Defendants' conduct provided it monopoly power in the PMB market and Defendants willfully acquired or maintained that power.  The public was directly and significantly harmed by Defendants' illegal and antitrust conduct.

184.    Solidstrip's damages coincide with damages to the public which naturally flow as the result of Defendants' conduct.

185.    Cundiff at all times acted as an agent, representative and/or intermediary for the U.S government entities. As an intermediary he acted or was subject to the direct or indirect control of the U.S government entities. He had the ability on behalf of the U.S government entities to cause the decision to be made by the U.S government entities of which specific seller would sell PMB to the U.S government entities and/or which requirements would be set by the U.S government entities for the purchase of PMB.

186.    As aforesaid, Defendants bribed and/or engaged in conduct to induce Cundiff to cause the U.S government entities to purchase PMB from Defendants and/or to set requirements for the purchase of PMB which would only allow the purchase of PMB from Defendants.

187.    Cundiff relied upon the bribes and/or conduct.  As a result of the bribes and/or conduct, the U.S government entities allowed Defendants a competitive advantage and/or awarded Defendants various contracts with the U.S government entities.

188.    No legitimate services were provided by Cundiff to Defendants in exchange for the

bribes and other conduct paid or given by Defendants.

189.    The aforesaid conduct constitutes a violation of 15 USCA 13(c) and constitutes commercial bribery.

190.    This conduct tends to undermine the fiduciary relationship between a buyer and its employee, agent, representative or other controlled intermediary in a transaction involving the sale or purchase of goods.

191.    As a direct and proximate result of the bribery and conduct in violation of 15 USCA 15(c), Solidstrip suffered actual Antitrust damages.  The illegal conduct of Defendants caused the direct competitor of Defendants, Solidstrip, to lose multiple sales and contracts.

192.    The actions committed by Defendants were committed in the course of commerce per 15 USCA 13(c). The sale of goods occurred as part of the flow of commerce among states and the federal government.

## Eighth Count

### Against All Defendants

### Violation of Wis. Stat. § 133.03

193.    Solidstrip incorporates by reference each of the preceding paragraphs as if set forth in this paragraph.

194.    The conspiracy engaged in by Defendants was and is in restraint of trade or commerce and is illegal.

195.    Defendants combined and conspired to monopolize trade or commerce.

WHEREFORE, Solidstrip respectfully requests judgment against Defendants as follows:

A.  On all counts, judgment against all named Defendants, jointly and severally pursuant to Wis. Stat. 895.045(2), in excess of thirty-five million dollars

($35,000,000.00) in an exact amount to be proven at trial;

B.  On all counts for which such relief is available, an award of Plaintiff's costs, including attorney fees and any increases to attorney fees justified by statute;

C.  On all counts, pre and post-judgment interest;

D.  On all counts for which such relief is available, punitive damages in an amount to be determined;

E.  On counts IV-VIII, Treble damages;

F.  Declare all contracts or agreements made by Defendants resulting from, growing out of or connected to conduct prohibited by Wis. Stat. 133.03 void; and

G.  Any other relief that the Court may deem proper and just.

## Jury Demand

Solidstrip demands a jury trial for all factual issues not admitted by the Defendant.

Dated this 8th day of September 2020.

HANSEN REYNOLDS LLC

/s/Timothy M. Hansen
Timothy M. Hansen, SBN 1044430
Email: thansen@hansenreynolds.com
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Phone: 414.273.8470
Fax: 414.273.8476

Sarah Troupis Ferguson, SBN 1061515
Email: sferguson@hansenreynolds.com
10 E. Doty Street, Suite 800
Madison, WI 53703
Phone: 608.841.1352
Fax: 414.273.8476

29

**O'HALLORAN, KOSOFF, GEITNER & COOK, LLC**

Jeffrey R. Rosenberg
To be admitted *Pro Hac Vice*
Email: jrosenberg@okgc.com
Gary Cook
Email: gcook@okgc.com
650 Dundee Road, 4th Flr.
Northbrook, Illinois 60062
Phone: 847-291-0200
Fax:    847-291-9230

*Attorneys for Plaintiff Solidstrip, Inc.*